# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| Bristol Myers Squibb Co., <br><br> *Plaintiff*, <br><br> –v– <br><br> XAVIER BECERRA, U.S. Secretary of Health & Human Services, *et al.*, <br><br> *Defendants*. | **Case No. 3:23-cv-03335-ZNQ-JBD** |
| Janssen Pharmaceuticals, Inc., <br><br> *Plaintiff*, <br><br> –v– <br><br> XAVIER BECERRA, U.S. Secretary of Health & Human Services, *et al.*, <br><br> *Defendants*. | **Case No. 3:23-cv-03818-ZNQ-JBD** |

**BRIEF OF NATIONALLY RECOGNIZED HEALTHCARE AND MEDICARE EXPERTS AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTEREST OF AMICI CURIAE ...................................................................................... 1

BACKGROUND .............................................................................................................. 3

   A.  The Medicare Program ........................................................................................ 3

   B.  The Drug Price Negotiation Program .................................................................. 6

ARGUMENT ................................................................................................................... 7

   A.  Congress Has Provided HHS Broad Authority to Regulate the Prices Medicare Will Pay for Healthcare Services Other than Drugs. .................................................................. 9

   B.  Congress Has Empowered Federal Healthcare Programs Other than Medicare to Regulate Drug Prices .................................................................................................. 11

      1.  Medicaid ...................................................................................................... 12

      2.  Direct Federal Purchasers .......................................................................... 13

      3.  VA, DoD, PHS, and the Coast Guard ...................................................... 13

      4.  Vaccines for Children (VFC) Program ...................................................... 14

      5.  340B ............................................................................................................ 15

      6.  Medicare ..................................................................................................... 15

   C.  Courts Have Consistently Rejected Takings Clause Challenges to Federal Healthcare Programs that Limit Prices .................................................................................. 15

      1.  Medicare ..................................................................................................... 16

      2.  The Emergency Medical Treatment and Active Labor Act ........................... 17

      3.  340B Drug Program .................................................................................... 18

      4.  Reimbursement Rates for Detainees in Federal Facilities ............................. 19

      5.  State Legislation ......................................................................................... 19

   D.  *NFIB* is Inapposite. ......................................................................................... 21

CONCLUSION ............................................................................................................... 22

## TABLE OF AUTHORITIES

**Cases**

*Baker Cnty. Med. Servs. Inc. v. U.S. Atty. Gen.*,
   763 U.S. F.3d 1274 (11th Cir. 2014) ........................................................... 16, 19, 20

*Bowles v. Willingham*,
   321 U.S. 503 (1944) ......................................................................................... 19

*Burditt v. U.S. Dep't of Health & Human Servs.*,
   934 F.2d 1362 (5th Cir. 1991) ..................................................................... 16, 20

*Dayton Area Chamber of Com. v. Becerra*,
   No. 3:23-cv-156, --- F. Supp. 3d ---, 2023 WL 6378423 (S.D. Ohio Sept. 29, 2023)...................16

*Eli Lilly & Co. v. U.S. Dep't of Health & Human Servs.*,
   2021 WL 5039566 (S.D. Ind. Oct. 29, 2021) ............................................. 18, 19, 20

*Garelick v. Sullivan*,
   987 F.2d 913 (2d Cir. 1993) ......................................................................... 16, 17, 20

*Horne v. Dep't of Agric.*,
   576 U.S. 350 (2015) ......................................................................................... 18

*Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of Pub. Welfare*,
   742 F.2d 442 (8th Cir. 1984) ....................................................................... 16, 20

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
   567 U.S. 519 (2012) ......................................................................................... 9, 21

*S.E. Ark. Hospice, Inc. v. Burwell*,
   815 F.3d 448 (8th Cir. 2016) ......................................................................... 18

*Sanofi-Aventis U.S., LLC v. U.S. Dep't of Health & Human Servs.*,
   570 F. Supp. 3d 129 (D.N.J. 2021) ............................................................... 18, 19

*St. Francis Hosp. Ctr. v. Heckler*,
   714 F.2d 872 (7th Cir. 1983) ......................................................................... 16, 17

*Va. Hosp. & Healthcare Ass'n v. Roberts*
   2023 WL 3132005 (E.D. Va. Apr. 27, 2023).................................................. 17, 20

*Whitney v. Heckler*,
   780 F.2d 963 (11th Cir. 1986) ..................................................................... 16, 17

**Statutes**

18 U.S.C. § 4006 ....................................................................................................... 19, 20

38 U.S.C. § 8126 ....................................................................................................... 13

42 U.S.C. § 256 ......................................................................................................... 15

42 U.S.C. § 1320f ..................................................................................................... 7

42 U.S.C. § 1320f-1 ................................................................................................. 7

42 U.S.C. § 1395 ....................................................................................................... 4

42 U.S.C. § 1395dd ................................................................................ 17

42 U.S.C. § 1395w ............................................................................. 4, 15

42 U.S.C. § 1396r ............................................................................ 12, 13

Balanced Budget Act of 1997,
Pub. L. No. 105-33 (1997) ................................................................ 11

Omnibus Budget Reconciliation Act of 1989,
Pub. L. 101-239 ................................................................................ 10

Patient Protection and Affordable Care Act of 2010,
Pub. L. No. 111-148 (2010) .............................................................. 11

**Regulations**

Notice Regarding Section 602 of the Veterans Health Care Act of 1992;
Contract Pharmacy Services,
61 Fed. Reg. 43,549 (Aug. 23, 1996) ............................................... 18

Notice Regarding 340B Drug Pricing Program—Contract Pharmacy Services,
75 Fed. Reg. 10,272 (Mar. 5, 2010) ................................................. 18

**Legislative Materials**

H.R. Rep. No. 116-324 (2019) ............................................................... 6

**Other Authorities**

*A Comparison of Brand-Name Drug Prices Among Selected Federal Programs*,
Cong. Budget Off. (Feb. 2021) ..................................................... 13, 14

Ashley Kirzinger *et al.*, *KFF Health Tracking Poll—February 2019: Prescription Drugs*,
Kaiser Fam. Found. (Mar. 1, 2019) ..................................................... 5

*Baseline Projections: Medicare*,
Cong. Budget Off. (May 2019) ......................................................... 5, 6

*Baseline Projections: Medicare*,
Cong. Budget Off. (May 2023) ............................................................. 5

Benson L. Dutton, Jr. & Peter McMenamin,
*The Medicare Economic Index: Its Background and Beginnings*,
Health Care Finance Rev. (Sept. 1981) ................................................ 9

Bisma A. Sayed, Kenneth Finegold, *et al.*, *Inflation Reduction Act Research Series: Medicare Part D Enrollee Out-of-Pocket Spending: Recent Trends and Projected Impacts of the Inflation Reduction Act*,
Assistant Sec. for Planning & Evaluation (July 7, 2023) ..................... 6

*Cost Estimate*,
Cong. Budget Off. (Sept. 7, 2022) ....................................................... 7

*Critical Access Hospitals Payment System*,
Medicare Payment Advisory Comm'n (Oct. 2022) ............................. 9

*Drug Coverage Under Different Parts of Medicare*,
CMS (Mar. 2023) ................................................................................. 4

Elizabeth Williams, Robin Rudowitz, & Alice Burns, *Medicaid Financing: The Basics*,
Kaiser Fam. Found. (Apr. 13, 2023) ............................................................................. 21

*Frequently Asked Questions About Prescription Drug Pricing and Policy*,
Cong. Rsch. Serv. (updated May 6, 2021) .................................................................. 6

Gabrielle Clerveau, Nancy Ochieng, *et al.*,
*A Snapshot of Sources of Coverage Among Medicare Beneficiaries*,
Kaiser Fam. Found. (Aug. 14, 2023) ......................................................................... 4

*Health Plans – General Information*,
CMS (May 9, 2023) .................................................................................................... 5

*HHS Selects the First Drugs for Medicare Price Negotiation*,
HHS (Aug. 29, 2023) .................................................................................................. 6

*Medicaid Drug Rebate Program*,
CMS ........................................................................................................................... 12

*Medicare Advantage Program Payment System*,
Medicare Payment Advisory Comm'n (revised Oct. 2021) ....................................... 4

*Medicare Hospital Payments: Adjusting for Variation in Geographic Area Wages*,
Cong. Rsch. Serv. (Mar. 3, 2021) ............................................................................. 10

*Medicare Monthly Enrollment*,
CMS (May 2023) ....................................................................................................... 4

*Medicare Primer*,
Cong. Rsch. Serv. (May 21, 2020)............................................................................. 9

Meena Seshamani, Elizabeth Fowler, & Chiquita Brooks-LaSure,
*Building on the CMS Strategic Vision: Working Together for a Stronger Medicare*,
CMS (Jan. 11, 2022) .................................................................................................. 4

Michael Cohen, Jared Maeda, & Daria Pelech,
*The Prices That Commercial Health Insurers and Medicare Pay for Hospitals' and Physicians' Services*,
Cong. Budget Off. (Jan. 2022) .................................................................................. 11

Nancy Ochieng & Gabrielle Clerveau,
*How Many Physicians Have Opted Out of the Medicare Program?*,
Kaiser Fam. Found. (Sept. 11, 2023) ........................................................................ 11

*NHE Fact Sheet*,
CMS (last modified July 31, 2023)............................................................................ 6

*Outpatient Hospital Services Payment System*,
Medicare Payment Advisory Comm'n (Oct. 2022) .................................................. 10

*Physician and Other Health Professional Payment System*,
Medicare Payment Advisory Comm'n (Oct. 2022) .................................................. 11

*Prescription Drug Pricing: Are We Getting Our Money's Worth?*,
U.S. Senate Special Comm. on Aging (U.S. Gov't Printing Off. 1989).................... 12

*Prescription Drugs*,
CMS ........................................................................................................................... 12

*Prescription Drugs: Spending, Use, and Prices*,
    Cong. Budget Off. (Jan. 2022) ............................................................................. 5, 6

*Prices for Brand Name Drugs Under Selected Federal Programs*,
    Cong. Budget Off. (June 2005) ............................................................................... 14

*Vaccines for Children Program (VFC): About VFC*,
    Ctrs. for Disease Control & Prevention (last reviewed Aug. 18, 2023) ................................... 14

*Vaccines for Children Program (VFC): VFC Childhood Vaccine Supply Policy*,
    Ctrs. for Disease Control & Prevention (last reviewed Feb. 18, 2016) ............................. 14, 15

## INTEREST OF *AMICI CURIAE*

The following *Amici* are nine nationally recognized experts in healthcare, healthcare finance, and Medicare, who place a high value on the financial stability of the Medicare program which is administered by the U.S. Department of Health and Human Services. As experts in healthcare and Medicare, *Amici* are qualified to explain how the recently enacted Drug Price Negotiation Program is consistent with the Government's well-established power to leverage its purchasing authority to constrain excessive fees charged to federal healthcare programs.

- **Stuart Altman, PhD** is the former Chairman of the Prospective Payment Assessment Commission (now the Congressional Medicare Payment Advisory Commission or MedPAC). Mr. Altman also served as Deputy Assistant Secretary for Planning and Evaluation/Health at the U.S. Department of Health Education and Welfare and as a member of the National Bipartisan Commission on the Future of Medicare.

- **Robert A. Berenson, MD** is the former Director of Health Plans and Providers, Health Care Financing Administration (the predecessor to Centers for Medicare & Medicaid Services). Dr. Berenson also served as Vice Chair of MedPAC.

- **Donald Berwick, MD** is a former Administrator of the Centers for Medicare & Medicaid Services. Dr. Berwick also served as the President and Chief Executive Officer of the Institute for Healthcare Improvement, a non-profit organization.

- **David Blumenthal, MD** is the former National Coordinator for Health Information Technology. Dr. Blumenthal is also the former President of the Commonwealth Fund.

- **Francis J. Crosson, MD** is the former Chairman of MedPAC. Dr. Crosson also served on the National Advisory Committee of the Agency for Healthcare Research and Quality.

- **Paul Ginsburg, PhD** is the former Executive Director at the Physician Payment Review Commission (the predecessor to MedPAC). Dr. Ginsburg also served as Vice Chair of MedPAC and Deputy Assistant Director of the Congressional Budget Office.

- **Marilyn Moon, PhD** is the former Public Trustee for the Social Security and Medicare Trust Funds. Dr. Moon also served as Chair of the Maryland Health Care Commission.

- **Robert D. Reischauer, PhD** is the President Emeritus of the Urban Institute. Mr. Reischauer also served as Director of the Congressional Budget Office, Public Trustee of the Social Security and Medicare Trust Funds, and Vice Chair of MedPAC.

- **Bruce Vladeck, PhD**. is the former Administrator of the Health Care Financing Administration (the predecessor to Centers for Medicare & Medicaid Services). Dr. Vladeck also served on the National Bipartisan Commission on the Future of Medicare.

## <u>INTRODUCTION</u>

In 2022, the Centers for Medicare & Medicaid Services (CMS) paid $973 billion to provide healthcare services to the elderly and disabled through the federal Medicare program. A program of this size is possible only because Congress has authorized CMS to manage costs. Over the past 50 years, federal legislation has empowered CMS to pay hospitals, physicians, and other providers much less for their services than they would receive from commercial insurance. In fact, prescription drugs are the only major component of Medicare that have not been subject to meaningful cost controls. Now, to address astronomical—and quickly growing—drug costs, Congress has enacted the Drug Price Negotiation Program (DPNP) to give the Department of Health and Human Services (HHS) limited authority to negotiate the prices Medicare pays for some of the highest-spending covered drugs. With respect to these select few prescription drugs, the DPNP finally puts some drug manufacturers in a position similar to that faced by Medicare-participating providers and physicians.

In challenging the DPNP, Janssen Pharmaceuticals, Inc. ("Janssen") and Bristol Myers Squibb Co. ("BMS") essentially attack the Government's ability to run the Medicare program. The *Amici*, nationally recognized experts in healthcare, healthcare finance, and Medicare, submit this brief to explain: that ensuring prescription drug price affordability is essential to the financial stability of the Medicare program; that the authority conferred on CMS by the DPNP to negotiate drug prices for the Medicare program is consistent with the authority that Congress has given CMS to limit excessive prices of other Medicare services; that this authority is also consistent with that given to other agencies to limit drug prices in other federal government programs; and, finally,

that the courts have uniformly rejected challenges to the federal authority to limit prices for drugs and services paid by federal healthcare programs.

## BACKGROUND

### A. The Medicare Program

As the largest single purchaser of healthcare in the United States, the Medicare program pays one in every five healthcare dollars spent.[1] Today, more than 65 million elderly or disabled Americans rely on Medicare for government-funded health insurance, which covers both healthcare services and prescription drugs for eligible beneficiaries.[2] *See generally* 42 U.S.C. § 1395 *et seq.* Traditional Medicare contains two parts: Part A covers services provided by hospitals and other institutional care providers, while Part B pays for outpatient services, including outpatient hospital services, physician visits, diagnostic tests and lab services, and drugs administered by physicians. Part B covers a relatively small number of drugs (617 in 2021), which are typically administered through infusion or injection.[3] Under Part B, Medicare enrollees are

---

[1]     *See* Meena Seshamani, Elizabeth Fowler, & Chiquita Brooks-LaSure, *Building on the CMS Strategic Vision: Working Together for a Stronger Medicare*, CMS (Jan. 11, 2022), https://www.cms.gov/blog/building-cms-strategic-vision-working-together-stronger-medicare#:~:text=As%20the%20largest%20single%20purchaser,force%20in%20the%20United%20States.

[2]     *See Medicare Monthly Enrollment*, CMS (May 2023), https://data.cms.gov/summary-statistics-on-beneficiary-enrollment/medicare-and-medicaid-reports/medicare-monthly-enrollment.

[3]     *Drug Coverage Under Different Parts of Medicare* at 1, CMS (Mar. 2023), https://www.cms.gov/outreach-and-education/outreach/partnerships/downloads/11315-p.pdf; *see Medicare Part B Spending by Drug*, CMS (last modified Mar. 6, 2023), https://data.cms.gov/summary-statistics-on-use-and-payments/medicare-medicaid-spending-by-drug/medicare-part-b-spending-by-drug.

often saddled with significant drug costs. Once beneficiaries reach their deductible ($226 in 2023), they pay 20% coinsurance on Part B drugs.[4]

CMS contracts with insurance plans to offer Medicare participants benefits under Part C.[5] Under Part C, Medicare beneficiaries can obtain benefits covered under Part A and Part B, plus additional benefits, typically including the Part D prescription drug benefit. Medicare payments to Part C plans are based on a percent of average per capita spending in traditional Medicare (which ranges from 95% to 115%).[6]

In 2003, Congress established Medicare Part D, a prescription drug benefit available to all Medicare recipients. Under Part D, Medicare subsidizes the cost of drugs administered outside of hospitals and outpatient facilities. 42 U.S.C. § 1395w-101 *et seq.* In Part D, Congress barred the federal government from participating in price negotiations between drug manufacturers or pharmacies and prescription drug plan sponsors through the "noninterference" clause. 42 U.S.C. § 1395w-111(i). In the years since the passage of Part D, however, it has become increasingly evident that although competition within the market for prescription drugs has largely succeeded

---

[4]     This copay will decrease under a provision of the Inflation Reduction Act which limits beneficiaries' coinsurance responsibility when a drug's price increases have outpaced inflation. Although many of Medicare's enrollees purchase supplemental insurance to defray the costs of coinsurance or are covered by Medicaid or retiree plans, nearly five million individuals are left to cover these costs on their own. *See* Gabrielle Clerveau, Nancy Ochieng, *et al.*, *A Snapshot of Sources of Coverage Among Medicare Beneficiaries*, Kaiser Fam. Found. (Aug. 14, 2023), https://www.kff.org/medicare/issue-brief/a-snapshot-of-sources-of-coverage-among-medicare-beneficiaries/.

[5]     *See Health Plans – General Information*, CMS (May 9, 2023), https://www.cms.gov/medicare/health-plans/healthplansgeninfo#:~:text=The%20Balanced%20Budget%20Act%20of,)%20program%2C%20effective%20January%201999.

[6]     *See Medicare Advantage Program Payment System*, Medicare Payment Advisory Comm'n (revised Oct. 2021), https://www.medpac.gov/wp-content/uploads/2021/11/medpac_payment_basics_21_ma_final_sec.pdf.

at moderating the growth of costs for prescription drugs that face competition from generics or medications treating the same condition, market forces cannot curb prescription drug prices in the absence of competition.[7] This leaves Medicare with no leverage over excessive drug prices, which must be borne by Medicare's beneficiaries and taxpayers.

Under Part D, beneficiaries' financial responsibility for drugs depends on how much they spend on prescription drugs in a given plan year, and some beneficiaries spend thousands of dollars out-of-pocket before they hit the catastrophic coverage phase in which copays and coinsurance for drugs are significantly reduced. In 2019, beneficiaries paid more than $16.1 billion out-of-pocket for Part D drugs, an increase of 27% over the previous five years.[8] Unsurprisingly, in the same year, 23% of seniors reported difficulty affording their prescription drugs.[9] Beginning in 2025, out-of-pocket spending by beneficiaries for Part D will be capped at $2,000 per year under the Inflation Reduction Act (IRA).[10]

Skyrocketing drug costs have also plagued the program. In 2022, Medicare spent $118 billion on Part D drugs—an increase of $36 billion from 2018.[11] These increases are largely driven

---

[7]   *Prescription Drugs: Spending, Use, and Prices* at 16, Cong. Budget Off. (Jan. 2022), https://www.cbo.gov/system/files/2022-01/57050-Rx-Spending.pdf.

[8]   *Frequently Asked Questions About Prescription Drug Pricing and Policy* at 8–9, Cong. Rsch. Serv. (updated May 6, 2021), https://crsreports.congress.gov/product/pdf/R/R44832/7.

[9]   *See* Ashley Kirzinger *et al.*, *KFF Health Tracking Poll—February 2019: Prescription Drugs*, Kaiser Fam. Found. (Mar. 1, 2019), https://www.kff.org/health-costs/poll-finding/kff-health-tracking-poll-february-2019-prescription-drugs/.

[10]   Bisma A. Sayed, Kenneth Finegold, *et al.*, *Inflation Reduction Act Research Series: Medicare Part D Enrollee Out-of-Pocket Spending: Recent Trends and Projected Impacts of the Inflation Reduction Act*, Assistant Sec. for Planning & Evaluation (July 7, 2023), https://aspe.hhs.gov/sites/default/files/documents/93a68f3c5ca949dcf331aa0ec24dd046/aspe-part-d-oop.pdf.

[11]   *Compare Baseline Projections: Medicare*, Cong. Budget Off. (May 2023), https://www.cbo.gov/system/files/2023-05/51302-2023-05-medicare.pdf,             *with Baseline*

by brand-name, single-source drugs without generic competition, the average net price of which more than doubled from 2009 to 2018.[12] By 2019, these drugs "accounted for almost three quarters (72 percent) of total Part D spending." H.R. Rep. No. 116-324, pt. 1 at 38 (2019). Moreover, Medicare's spending on prescription drugs is not expected to slow down. During the next decade, CMS projects that Medicare will spend between 4% and 12% more on prescription drugs (not including drugs administered in hospitals or physician's offices) each year.[13]

### B. The Drug Price Negotiation Program

Through the creation of the DPNP, Congress has begun the process of stemming the high costs and rapidly increasing prices of drugs for Medicare and its beneficiaries by allowing the Secretary of HHS to negotiate prices of a select number of the highest-spending drugs in Part D, and later, Part B. *See* Inflation Reduction Act, Pub. L. 117-169, 42 U.S.C. § 1320f *et seq.* On August 29, 2023, HHS selected 10 of the highest-spending, single-source, brand-name drugs that have been on the market for at least seven years (or 11 years for biologics).[14] *See* §§ 1320f-1(b)– (d). From October 1, 2023 until August 1, 2024, CMS and manufacturers of the selected drugs that choose to participate will negotiate a price for each drug. *Id.* § 1320f(b)–(d). If CMS and the manufacturer agree on a price during this period, the drug will become available to Part D at that price in 2026. 42 U.S.C.§ 1320f-1(c)(2).

---

*Projections:      Medicare*,      Cong.      Budget      Off.      (May      2019), https://www.cbo.gov/system/files?file=2019-05/51302-2019-05-medicare.pdf.

[12]      *Prescription Drugs: Spending, Use, and Prices*, *supra* note 7, 16.

[13]      *NHE Fact Sheet*, CMS (last modified July 31, 2023), https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/NationalHealthExpendData/NHE-Fact-Sheet#:~:text=NHE%20grew%202.7%25%20to%20%244.3,17%.

[14]      *See HHS Selects the First Drugs for Medicare Price Negotiation*, HHS (Aug. 29, 2023), https://www.hhs.gov/about/news/2023/08/29/hhs-selects-the-first-drugs-for-medicare-drug-price-negotiation.html.

As outlined in more detail in the Government's brief, Mem. of Law in Support of Defs. Opp'n to Pls. Mot. Summ. J. and Cross-Mot. ("Defs. Cross-Mot.") at 6, ECF No. 33-1, drug manufacturers that do not wish to participate in negotiations or enter an agreement may transfer their interest in the selected drug to another entity; withdraw from Medicare Parts B and D and Medicaid (which is similar to the only option currently available to many providers who choose not to accept Medicare rates); or pay an excise tax.[15]

The DPNP is precisely tailored to address the issues with Part D's original, fragmented model of price negotiations, where the program is administered by regional plan sponsors that separately negotiate with individual drug companies, which has yielded skyrocketing prescription drug prices paid by Part D. CMS is only empowered to select a drug for negotiation where that drug has had an unchallenged market position for at least seven years and is one of the highest spending drugs paid for by taxpayers and beneficiaries. For these drugs, Congress has designed a cautious negotiation process, which starts off with a small set of covered drugs under Part D and increases slowly to include some covered drugs under Part B. These innovations are expected to begin to address the precipitous recent rise in drug prices impacting both the Medicare program and beneficiaries. The Congressional Budget Office projects that the DPNP will save nearly $100 billion in Medicare spending from 2026 to 2031—a significant savings, but a small percentage of what the program will spend on prescription drugs during that time.[16]

## ARGUMENT

The DPNP is consistent with the federal government's well-established ability to regulate

---

[15]    For the reasons set forth in the Government's brief, *see* Defs. Opp'n at 16–18, Janssen and BMS are incorrect that drug manufacturers will not be permitted to withdraw from the Medicare program at will.

[16]    *See Cost Estimate*, Cong. Budget Off. (Sept. 7, 2022), https://www.cbo.gov/system/files/2022-09/PL117-169_9-7-22.pdf.

the prices that the Medicare program pays for services by physicians, hospitals, and other providers. Further, Congress has also extended this cost-controlling authority to Medicaid, the Department of Veterans Affairs (VA), the Coast Guard, the Department of Defense (DoD), and the Vaccines for Children Program, which are all entitled to significant discounts or rebates from drug companies when they purchase prescription drugs. Likewise, in the 340B Drug Program, Congress has required substantial discounts for drugs used by certain providers serving low-income populations. Congress has also limited prices for Part D drugs in certain circumstances through the Affordable Care Act (ACA). Janssen and BMS cannot distinguish these long-standing statutory authorities to establish prices from HHS's ability to likewise negotiate prescription drug prices paid by Medicare through the DPNP.

In claiming that the DPNP is an uncompensated taking of property in violation of the Constitution, Janssen and BMS seek to relitigate positions repeatedly rejected by courts in response to other challenges brought against federal healthcare programs. Moreover, Janssen and BMS's reliance on *Nat'l Fed'n of Indep. Bus. v. Sebelius* (*NFIB*), 567 U.S. 519 (2012) is entirely misplaced. *See* Janssen Mot. Summ. J. at 22, 39; BMS Mot. Summ. J. at 34–36. The Supreme Court's ruling on the Medicaid expansion in *NFIB* hinged on the rights of States under the Tenth Amendment in jointly administering the Medicaid program with the federal government. Such rights do not apply to private parties' relationships with the federal government.[17]

---

[17]     For the reasons set forth in the Government's Cross-Motion, Janssen and BMS's arguments that the DPNP violates the First Amendment and that it imposes unconstitutional conditions also fail. *See* Defs. Cross-Mot. at 31–35, 36–38.

**A. Congress Has Provided HHS Broad Authority to Regulate the Prices Medicare Will Pay for Healthcare Services Other than Drugs.**

Initially, there were limited cost controls in Medicare. Under both Part A and Part B, healthcare providers were entitled to "reasonable costs" for hospital and institutional services or "usual, customary and reasonable charges" for physicians and other medical services.[18] But it soon became clear that without additional regulatory limits, Medicare's original "reasonable cost" system was unsustainable. To protect taxpayers from having to pay excessive rates for Medicare services, Congress has amended these payment structures numerous times over the past 50 years, giving HHS increasing authority to curb costs. Thus, in 1972, six years after the Government first began paying Medicare providers, Congress limited reasonable costs and charges to the Medical Economic Index, which tracks the physician's cost of doing business (as opposed to what the physician charges patients).[19]

In subsequent years, Congress began setting rates for reimbursement by adopting prospective payment systems for hospitals and fee schedules for physicians and other providers, which are updated annually and establish the payment rates for the following year.[20] In 1983, the Government began using the inpatient prospective payment system (IPPS) to set reimbursement

---

[18] *Medicare Primer* at 3, Cong. Rsch. Serv. (May 21, 2020), https://crsreports.congress.gov/product/pdf/R/R40425/55. Under this model, physicians were paid according to "the lowest of (1) the physician's billed charge for the service, (2) the physician's customary charge for the service, or (3) the prevailing charge for that service in the community." *Id.* at 3 n.7.

[19] *See* Benson L. Dutton, Jr. & Peter McMenamin, *The Medicare Economic Index: Its Background and Beginnings*, Health Care Finance Rev. (Sept. 1981).

[20] Critical access hospitals (CAHs) represent a small statutory exception. Facilities with no more than 25 beds that primarily operate in rural settings, CAHs may bill Medicare for reasonable costs. *See Critical Access Hospitals Payment System*, Medicare Payment Advisory Comm'n (Oct. 2022), https://www.medpac.gov/wp-content/uploads/2021/11/MedPAC_Payment_Basics_22_CAH_FINAL_SEC.pdf. As of October 2022, only about 1,300 hospitals nationwide were designated as CAHs.

rates for hospitals treating Medicare beneficiaries in acute inpatient settings, based on diagnosis-related groups (DRGs).[21] Under this methodology, the Medicare program establishes a fee schedule for the following year that pays hospitals a base payment amount (based on data from hospitals in the program), which includes payments for operating costs and capital expenses, subject to adjustments for geographic location, diagnoses, quality performance, and other factors.[22] The base IPPS payment amount is updated annually to account for inflation and other changes in the components of the rate.[23]

Similarly, for services provided in hospital outpatient departments under Part B,[24] in 2000 CMS implemented the outpatient prospective payment system (OPPS) annually to set reimbursement rates for the subsequent year.[25] Using a coding system that classifies services based on their clinical attributes and cost, the OPPS sets payment rates by multiplying the average cost of services in the relevant classification by a wage-adjusted conversion factor.[26]

Today, Medicare also regulates the prices it pays physicians under Part B pursuant to the Medicare fee schedule (MFS).[27] The MFS is an administered price structure developed through a relatively complex formula grounded in elaborate data analyses. Relying on the same coding

---

[21]    *See Medicare Hospital Payments: Adjusting for Variation in Geographic Area Wages*, Cong. Rsch. Serv. (Mar. 3, 2021), https://crsreports.congress.gov/product/pdf/R/R46702.

[22]    *Id.*

[23]    *Id.*

[24]    The OPPS does not include payments for a physician's services. *See Outpatient Hospital Services Payment System*, Medicare Payment Advisory Comm'n (Oct. 2022), https://www.medpac.gov/wp-content/uploads/2022/10/MedPAC_Payment_Basics_22_OPD_FINAL_SEC_v3.pdf.

[25]    *Id.*

[26]    *Id.*

[27]    *See* Omnibus Budget Reconciliation Act of 1989 (OBRA 1989), Pub. L. 101-239.

system used by the OPPS, the MFS generally sets payment rates by service—including everything from discrete services like injections to bundles of services for more complex procedures like surgeries.[28] The MFS provides for far lower prices than what commercial insurers pay, with commercial insurers paying an average of 129% of MFS prices for physician services.[29] Medicare also regulates prices for services administered to beneficiaries of private plans under Part C, where plans are paid based on bids under a formula-based payment system, using benchmarks tied to the average spending under traditional Medicare per beneficiary under Parts A and B.[30]  In addition to all these programs, throughout Medicare's history, Congress has repeatedly imposed additional limits on increases to hospital and physician payment rates.[31]

    None of these payment systems is subject to negotiation. To the contrary, providers other than physicians who do not agree to these terms must totally opt out of the Medicare program. Physicians who do not contract with Medicare must accept a lower payment from the program.[32]

**B.  Congress Has Empowered Federal Healthcare Programs Other than Medicare to Regulate Drug Prices.**

    For more than 30 years, Congress has attempted to address the rapidly rising costs of drugs for patients and federal healthcare programs by placing significant restrictions on drug prices paid

---

[28]    *See Physician and Other Health Professional Payment System*, Medicare Payment Advisory Comm'n (Oct. 2022), https://www.medpac.gov/wp-content/uploads/2021/11/MedPAC_Payment_Basics_22_Physician_FINAL_SEC.pdf.

[29]    Michael Cohen, Jared Maeda, & Daria Pelech, *The Prices That Commercial Health Insurers and Medicare Pay for Hospitals' and Physicians' Services*, Cong. Budget Off. (Jan. 2022), https://www.cbo.gov/publication/57778.

[30]    *See Medicare Advantage Program Payment System*, *supra* note 6.

[31]    *See, e.g.*, Balanced Budget Act of 1997, Pub. L. No. 105-33 (1997); Patient Protection and Affordable Care Act of 2010, Pub. L. No. 111-148 (2010).

[32]    *See* Nancy Ochieng & Gabrielle Clerveau, *How Many Physicians Have Opted Out of the Medicare Program?*, Kaiser Fam. Found. (Sept. 11, 2023), https://www.kff.org/medicare/issue-brief/how-many-physicians-have-opted-out-of-the-medicare-program/.

by Medicaid; all direct federal purchasers of drugs; federal healthcare programs administered by the VA, the DoD, the Coast Guard, and the Public Health Service (PHS); and the Vaccines for Children (VFC) program administered by HHS. Through Section 340B of the Public Health Service Act, Congress has restricted prices for certain drugs used by nonprofit hospitals and federally funded health centers. In recent years, Congress has also imposed some modest regulation of prescription drug prices in Part D.

1. *Medicaid*

In response to rising drug prices and projected increased Medicaid spending, under the Medicaid Prescription Drug Rebate Program (MDRP), created in 1990 by the Omnibus Reconciliation Act,[33] a drug company that chooses to participate in the Medicaid program must enter into a rebate agreement with HHS providing that it will rebate a specified portion of the Medicaid payment for the drug to the States, which affects the share of Medicaid costs paid by the federal government. 42 U.S.C. § 1396r-8. In exchange, Medicaid will cover nearly all the manufacturer's FDA-approved drugs. *Id.* Though the pharmacy benefit is optional, all States cover prescription drugs,[34] and approximately 780 drug manufacturers participate in the MDRP.[35]

For brand-name drugs, the rebate is 23.1% of Average Manufacturer Price (AMP) or the difference between AMP and "best price," whichever is greater. 42 U.S.C. § 1396r-8(c). Best price

---

[33]   *Prescription Drug Pricing: Are We Getting Our Money's Worth?*, U.S. Senate Special Comm. on Aging (U.S. Gov't Printing Off. 1989), https://www.aging.senate.gov/imo/media/doc/reports/rpt289.pdf.

[34]   *Prescription Drugs*, CMS, https://www.medicaid.gov/medicaid/prescription-drugs/index.html#:~:text=Although%20pharmacy%20coverage%20is%20an,within%20their%20state%20Medicaid%20programs.

[35]   *See Medicaid Drug Rebate Program*, CMS, https://www.medicaid.gov/medicaid/prescription-drugs/medicaid-drug-rebate-program/index.html#:~:text=Approximately%20780%20drug%20manufacturers%20currently,of%20the%20Social%20Security%20Act.

is defined as the lowest available price to any wholesaler, retailer, or provider, excluding certain government programs, such as the health program for veterans. *Id.* § 1396r-8(c)(1)(C). AMP is defined as the average price paid to drug manufacturers by wholesalers and retail pharmacies. *Id.* § 1396r-8(k)(1)(A).[36] For generic drugs, the rebate amount is 13% of AMP, and there is no "best price" provision. There is also an inflationary penalty if the drug's price rises faster than the rate of inflation. *Id.* § 1396r-8(c)(2).

2.   *Direct Federal Purchasers*

The Federal Supply Schedule (FSS) establishes prices available to all direct federal purchasers, including the VA, DoD, PHS, and the Coast Guard. 38 U.S.C. § 8126(a)–(b). The FSS is intended to allow direct federal purchasers to buy brand-name drugs at prices equal to or below the lowest prices negotiated between manufacturers and their most-favored commercial customers, defined as the customers that receive the best discount or price agreement.[37] If a drug company fails to comply with this provision, it may not receive payments from Medicaid, DoD, PHS, the Coast Guard, or any entity that receives funding under the Public Health Service Act. 38 U.S.C. § 8126(a).

3.   *VA, DoD, PHS, and the Coast Guard*

The 1992 Veterans Health Care Act created an additional mechanism for lowering drug prices for the four largest federal purchasers: the VA, DoD, PHS, and the Coast Guard (collectively

---

[36]    This price includes discounts provided to retail pharmacies but does not include service fees or rebates or discounts to other purchasers (like managed care organizations and pharmacy benefit managers). *See* 42 U.S.C. § 1396r-8(k)(1)(B).

[37]    *See A Comparison of Brand-Name Drug Prices Among Selected Federal Programs* at 10–13, Cong. Budget Off. (Feb. 2021), https://www.cbo.gov/publication/57007.

referred to as the "Big Four").[38] 38 U.S.C. § 8126(b). The federal ceiling price (FCP) established by the 1992 Act is 76% of the non-FAMP or the average sales price to purchasers outside the federal government, with an adjustment if the non-FAMP grew more quickly than the rate of inflation during the previous one-year period.[39]

The combination of the FSS, this discount, and the fact that the VA is a single, integrated health system with a unified list of covered drugs strengthens the VA's bargaining position to negotiate drug prices. As a result, the VA is generally receiving the lowest drug prices of any federal program—paying around 55% of the average net price paid by Medicare Part D.[40]

4.  *Vaccines for Children (VFC) Program*

In 1993, as part of the Omnibus Budget Reconciliation Act, Congress created the VFC Program to expand access to childhood vaccines by providing free vaccines to eligible children.[41] Children are eligible for participation in the VFC Program if they are eligible for Medicaid, uninsured, underinsured, or are American Indian or Native Alaskan.[42] The VFC Program

---

[38]     The prices available to the Big Four for brand-name drugs are the lower of the FFS price and the cap set by this law. *See Prices for Brand Name Drugs Under Selected Federal Programs* at 8, Cong. Budget Off. (June 2005), https://www.cbo.gov/sites/default/files/109th-congress-2005-2006/reports/06-16-prescriptdrug.pdf.

[39]     *Id.*

[40]     *A Comparison of Brand-Name Drug Prices Among Selected Federal Programs*, *supra* note 37).

[41]     *Vaccines for Children Program (VFC): VFC Childhood Vaccine Supply Policy*, Ctrs. for Disease Control & Prevention (last reviewed Feb. 18, 2016), https://www.cdc.gov/vaccines/programs/vfc/about/distribution.html.

[42]     *Vaccines for Children Program (VFC): About VFC*, Ctrs. for Disease Control & Prevention (last reviewed Aug. 18, 2023), https://www.cdc.gov/vaccines/programs/vfc/about/index.html.

authorizes HHS to negotiate the price of vaccines and purchase doses directly from manufacturers at discounted prices.[43]

5. *340B*

In 1992, also as part of the Veterans Health Care Act, Congress created the 340B Program under Section 340B of the Public Health Service Act to provide certain nonprofit hospitals and federally funded clinics servicing low-income patients (under the statute, "covered entities") with outpatient drug discounts comparable to those available to state Medicaid agencies. As a condition of having their outpatient drugs covered through Medicaid and Medicare Part B, drug manufacturers are required to offer 340B hospitals and clinics outpatient drugs at or below a discount of 23.1% for brand drugs and 13% for generic drugs. 42 U.S.C. § 256b(a)(1).

6. *Medicare*

Through the ACA in 2010, Congress also created mandatory discounts for brand-name drugs in certain circumstances under Part D where beneficiaries are responsible for paying a portion of their drug's cost. *See* 42 U.S.C. § 1395w-114a. This requirement will be replaced in 2025 with another mandatory discount of 20% that will apply after a beneficiary hits the annual out-of-pocket $2,000 threshold, per a provision of the IRA not challenged by Janssen or BMS in this litigation. *See id.* § 1395w-114c(g)(4)(ii).

**C. Courts Have Consistently Rejected Takings Clause Challenges to Federal Healthcare Programs that Limit Prices.**

As the Government has explained, *see* Defs. Cross-Mot. at 11–30, Janssen and BMS's Takings Clause arguments have no support in existing case law. Just last month, the Southern

---

[43] *See Vaccines for Children Program (VFC): VFC Childhood Vaccine Supply Policy*, *supra* note 41.

District of Ohio rejected an analogous claim in denying plaintiffs' motion for a preliminary injunction against the DPNP. *Dayton Area Chamber of Com. v. Becerra*, No. 3:23-cv-156, --- F. Supp. 3d. ---, 2023 WL 6378423 (S.D. Ohio Sept. 29, 2023) (*Chamber*). In fact, although numerous regulated parties have brought Fifth Amendment Takings Clause challenges against federal healthcare programs over the past 40 years, to our knowledge not one of those claims has succeeded. To the contrary, "a long line of cases instructs that no taking occurs where a person or entity voluntarily participates in a regulated program or activity." *Baker Cnty. Med. Servs. Inc. v. U.S. Atty. Gen.*, 763 U.S. F.3d 1274, 1276 (11th Cir. 2014); *Garelick v. Sullivan*, 987 F.2d 913, 916 (2d Cir. 1993), *cert. denied*, 510 U.S. 821 (1993); *Burditt v. U.S. Dep't of Health & Human Servs.*, 934 F.2d 1362, 1376 (5th Cir. 1991); *Whitney v. Heckler*, 780 F.2d 963 (11th Cir. 1986); *Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of Pub. Welfare*, 742 F.2d 442, 446 (8th Cir. 1984); *St. Francis Hosp. Ctr. v. Heckler*, 714 F.2d 872, 875 (7th Cir. 1983).

1. *Medicare*

In *Garelick v. Sullivan*, the Second Circuit rejected the plaintiff anesthesiologists' challenge to a federal statute limiting reimbursement rates for services provided under Medicare Part B. 987 F.2d at 914–15. Although no provision of federal law mandated the anesthesiologists' participation in Medicare, the plaintiffs argued that they were compelled to participate in the program because New York state law effectively required hospitals to treat all Medicare patients, and it would not be "economically viable" for the anesthesiologists to practice outside of hospitals, where most of the procedures requiring their services are performed. *Id.* at 917. But the court explained, "economic hardship is not equivalent to legal compulsion," which is required for a regulation to give rise to a taking under the Fifth Amendment. *Id.*; *see also Heckler*, 714 F.2d at

875 (The "fact that practicalities may in some cases dictate participation does not make participation involuntary.").

    2.   *The Emergency Medical Treatment and Active Labor Act*

Courts have also rejected takings challenges to the Emergency Medical Treatment and Active Labor Act ("EMTALA"), which requires Medicare-participating hospitals to provide medical care (screening and stabilization services) to all patients who present with an emergency medical condition, regardless of their ability to pay for care. 42 U.S.C. §§ 1395dd(a), (b)(1)(A), (h). Hospitals that violate EMTALA are subject to exclusion from Medicare and state healthcare programs as well as penalties of up to $119,942 (adjusted for inflation) per violation[44] and civil damages available under the relevant state personal injury laws from suits brought by individuals harmed by such violation. *Id.* §§ 1395dd(d)(1)(A), (2)(A). Recently, in *Virginia Hospital & Healthcare Association v. Roberts*, the Eastern District of Virginia rejected the plaintiffs' claim that the federal government effected a *per se* taking through EMTALA's mandatory emergency care requirement. 2023 WL 3132005 (E.D. Va. Apr. 27, 2023). The plaintiffs argued that they were "virtually compelled" to provide emergency services without just compensation under EMTALA because Virginia's "certificate of public need" program required participating hospitals to treat Medicare and Medicaid patients, and Medicare participants are required to participate in EMTALA. *Id.* at *4–5. The court disagreed. The correct question was whether the plaintiffs' "participation in Medicaid and Medicare are voluntary as a matter of *federal* law."[45] *Id.* at *23.

---

[44]    For physicians and hospitals with fewer than 100 beds, the maximum penalty is $59,973.

[45]    The Eastern District of Virginia also rejected the plaintiffs' comparison to *Horne v. Dep't of Agric.*, 576 U.S. 350 (2015), which Janssen and BMS rely on extensively. The court explained that "*Horne* is distinguishable because it involved a regulatory scheme in which plaintiffs were forced to yield part of their property, their crop of raisins, to the Government without receiving *any benefit whatsoever.*" *Va. Hosp. & Healthcare Ass'n*, 2023 WL 3132005, at *23.

3. *340B Drug Program*

Courts have also dismissed takings challenges to the 340B Drug Program, where as a condition to participating in Medicaid and Medicare Part B, drug companies are required to provide significant discounts on outpatient prescription drugs purchased by public and not-for-profit hospitals and federally funded clinics serving low-income patients to provide to their patients. *Eli Lilly & Co. v. U.S. Dep't of Health & Human Servs.*, 2021 WL 5039566 (S.D. Ind. Oct. 29, 2021); *Sanofi-Aventis U.S., LLC v. U.S. Dep't of Health & Human Servs.*, 570 F. Supp. 3d 129 (D.N.J. 2021), *reversed on other grounds*, 58 F.4th 696 (3d Cir. 2023). Since the beginning of the program, drug companies provided 340B discounts for drugs dispensed through both in-house and outside (*i.e.*, contract) pharmacies. *See e.g.*, Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services, 61 Fed. Reg. 43,549 (Aug. 23, 1996); Notice Regarding 340B Drug Pricing Program—Contract Pharmacy Services, 75 Fed. Reg. 10,272 (Mar. 5, 2010). Beginning in 2020, various drug companies challenged the requirement that they provide discounted drugs to covered entities via an unlimited number of contract pharmacies.

The Eli Lilly Company argued that the program effected a taking "by forcing Lilly to transfer its drugs to contract pharmacies solely to serve those entities' private interests, and that, by requiring Lilly to succumb to a private taking of property to obtain coverage of its drugs under federal health-insurance programs," the program imposed "an unconstitutional condition on a valuable government benefit." *Eli Lilly*, 2021 WL 5039566, at *21. The Southern District of Indiana disagreed. The plaintiff's voluntary participation in the 340B Drug Program "forecloses the possibility that the statute could result in an imposed taking of private property which would give rise to the constitutional right of just compensation." *Id.* (quoting *S.E. Ark. Hospice, Inc. v. Burwell*, 815 F.3d 448, 450 (8th Cir. 2016)). Although withdrawing from 340B—and necessarily,

Medicaid and Medicare Part B—would "result in a significant financial impact for" the plaintiff, such realities were insufficient to find legal compulsion for the purposes of the court's takings analysis. *Id.* In a separate lawsuit, filed in this Court, Novo Nordisk also made the same takings argument, which that court rejected on multiple grounds including that "Novo has not lost all 'economically viable use' associated with 340B-priced drugs." *Sanofi-Aventis U.S., LLC*, 570 F. Supp. 3d at 207-210.

4. *Reimbursement Rates for Detainees in Federal Facilities*

The Eleventh Circuit likewise upheld 18 U.S.C. § 4006(b)(1), a federal statute setting maximum reimbursement rates for emergency services provided to detainees in federal jails and prisons at Medicare reimbursement rates. *Baker Cnty. Med. Servs.*, 763 F.3d at 1280. Although § 4006 was not cross-referenced in the Medicare statute and § 4006 did not require the provision of emergency services for federal detainees, the plaintiff hospital argued that the statute effected an unconstitutional taking because, under both EMTALA and Florida state law, the plaintiff was required to provide emergency care for all patients, including detainees. *See id.* at 1279–80. Even leaving aside the state law that essentially required participation in EMTALA, the plaintiff hospital argued that it could not practically withdraw from Medicare because such withdrawal would result in a "grave financial setback" and leave Medicare participants in the plaintiff's rural county with no other place to receive care. *Id.* The court was unpersuaded, finding that the plaintiff nonetheless voluntarily participated in Medicare (and, accordingly, voluntarily provided care to federal detainees), so the limits to reimbursement rates for such care under § 4006 was not a taking under the Fifth Amendment. *Id.* at 1278 (citing *Bowles v. Willingham*, 321 U.S. 503 (1944)).

5. *State Legislation*

According to the Eighth Circuit, a Minnesota state statute requiring nursing homes

participating in Medicaid to accept limits on rates charged to certain residents did not constitute a *per se* taking under the Fifth Amendment. *See Minn. Ass'n of Health Care Facilities*, 742 F.2d at 446. The court explained that despite "the strong financial inducement to participate in Medicaid . . . a nursing home's decision to do so is nonetheless voluntary," which "forecloses the possibility that the statute could result in an imposed taking of private property which would give rise to the constitutional right of just compensation." *Id.* To support its analysis, the court contrasted participation in federal healthcare programs with participation in public utilities because, unlike public utility providers, nursing homes "have freedom to decide whether to remain in business and thus subject themselves voluntarily to the limits imposed by [the state] on the return they obtain from investment of their assets in nursing home operation." *Id.*

*          *          *          *

Like the plaintiffs in *Garelick*, *Virginia Hospital & Healthcare Association*, *Burditt*, *Eli Lilly*, *Baker County Medical Services*, and *Minnesota Association of Health Care Facilities*, Janssen and BMS have not suffered an unconstitutional taking. In fact, Janssen and BMS's arguments are weaker than the claims brought by the plaintiff anesthesiologists in *Garelick*. Unlike drug companies, which market their drugs outside of Medicare and Medicaid, virtually the only place of anesthesiologists' practice is hospitals. But as the Second Circuit pointed out, economic *pressure* to participate in a federal program does not constitute a taking. *Garelick*, 987 F.2d at 917. Further, unlike in *Baker County Medical Services*, Janssen and BMS do not argue that they are somehow legally compelled to participate in Medicare.

Rather, Janssen and BMS essentially contend that their desire to continue reaping profits from their relationships with Medicare and Medicaid leaves them without a choice not to participate. But according to the courts that have evaluated this issue, it does not matter that a

significant portion of Janssen and BMS's business is selling drugs to Medicare; they do so voluntarily. As a result of that choice, Janssen and BMS must abide by the Medicare program's requirements, including the requirements of the DPNP. Even if Janssen and BMS's withdrawal from Medicare would cause significant financial loss, their economic hardship does not support their Fifth Amendment claims.

### D.  *NFIB* is Inapposite.

As the Government explains in its Cross-Motion, *see* Defs. Cross-Mot. 19–25, *NFIB* has no application to the issues in this case. In *NFIB*, the Supreme Court considered a provision of the ACA requiring that States expand their Medicaid programs to cover low-income adults or risk the federal government withholding all Medicaid funding. *See* 567 U.S. at 585. Unlike Medicare, which is 100% funded by the federal government and the payments of beneficiaries, Medicaid is jointly administered and funded by the federal government and the States, which in fiscal year 2021 paid 31% of Medicaid's total spending.[46] In *NFIB*, the Court addressed whether the ACA's requirement that States accept and partially pay for the ACA's expansion of Medicaid as a condition to remaining in the Medicaid program violated the Tenth Amendment, which limits the power of the federal government to compel action by the States. *See* 567 U.S. at 585 (explaining that "Congress may not simply 'conscript state [agencies] into the national bureaucratic army,'" and that is what it is attempting to do with the Medicaid expansion") (internal citation omitted). *NFIB* does not apply here because, unlike the States which have rights under the Tenth

---

[46]     *See* Elizabeth Williams, Robin Rudowitz, & Alice Burns, *Medicaid Financing: The Basics*, Kaiser Fam. Found. (Apr. 13, 2023), https://www.kff.org/medicaid/issue-brief/medicaid-financing-the-basics/#:~:text=Medicaid%20spending%20is%20shared%20by,the%20federal%20government%20paid%2069%25.

Amendment, Janssen and BMS are private companies that can choose whether to enter into contracts to sell their drugs to the federal government and other healthcare providers.

## **CONCLUSION**

For the foregoing reasons and those set forth in Defendants' Memorandum of Law in Support of Defendants' Opposition to Plaintiff's Motion for Summary Judgment and Cross-Motion, this Court should grant Defendants' Cross-Motion and deny Plaintiffs' Motions for Summary Judgment.

Date: October 23, 2023                              Respectfully submitted,

                                                   /s/ John W. Leardi
                                                   John W. Leardi
                                                   Buttaci Leardi & Werner LLC
                                                   212 Carnegie Center, Ste. 202
                                                   Princeton, NJ 08540
                                                   (609) 799-5150
                                                   jwleardi@buttacilaw.com

                                                   William B. Schultz*
                                                   Margaret M. Dotzel*
                                                   Alyssa M. Howard*
                                                   Zuckerman Spaeder LLP
                                                   1800 M Street NW, Suite 1000
                                                   Washington, D.C.
                                                   (202) 778-1800
                                                   wschultz@zuckerman.com

                                                   *Counsel for Amici Curiae*

                                                   *pro hac vice* applications forthcoming